Donald Dee **HARTMAN**, Plaintiff-Appellant,

v.

**MILLER HYDRO COMPANY**, Defendant-Appellee.

No. 73–1803.

United States Court of Appeals,
Tenth Circuit.

Argued April 16, 1974.

Decided June 28, 1974.

Rehearing Denied July 23, 1974.

Bradley Post, Wichita, Kan. (Orval L. Fisher, Wichita, Kan., on the brief), for plaintiff-appellant.

Gerald Sawatzky, Wichita, Kan. (Mikel L. Stout, Wichita, Kan., on the brief), for defendant-appellee.

Before LEWIS, Chief Judge, and HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

This products liability case, based on diversity, arises out of personal injuries sustained by the appellant Donald Dee Hartman, when his trousers, and subse-

quently the middle region of his body, became entangled in the revolving shaft of a bottle washing machine manufactured by appellee Miller Hydro Company (Miller Hydro) and owned by his employer, The Pepsi Cola Bottling Company (Pepsi Cola).

Hartman instituted suit against Miller Hydro in the United States District Court for the District of Kansas, premising liability upon ordinary negligence and strict liability. Essentially, the latter claim alleged faulty design by Miller Hydro in that it (1) failed to install a guard over the revolving shaft, and (2) failed to provide an emergency stop switch for the shaft, near the operator's station. Upon hearing all of the evidence and instructions, the jury returned a verdict for Miller Hydro.

On appeal, Hartman contends the trial court erred in instructing the jury that liability was dependent on Miller Hydro's knowledge of the probable danger, and in requiring him to prove such knowledge.

Miller Hydro, a Georgia corporation engaged in the design and manufacture of large machines, custom built a large bottle washing machine for the Pepsi Cola plant in Wichita, Kansas. It was designed to receive dirty pop bottles from a conveyor (which was driven by a revolving shaft), convey them into the machine where they were washed, and discharge them at the other end. The machine itself was a component part of connecting machines making up a production line consisting of a decaser (removes bottles from cases), an extension tongue (takes bottles to washer), and a filler (fills and caps bottles).

The machine was manufactured, assembled, tested and inspected at Miller Hydro's Georgia plant, and then dismantled and shipped to Wichita in pieces where it was reassembled by Pepsi Cola

employees under supervision of Miller Hydro installation engineers.

Once in operation (early in 1969), bottles tended to jam up or upset before entering the machine, requiring an employee to stand near the machine to remedy the situation. Although the proper place for an employee to position himself was in dispute at trial, it appears that employees often stood in the vicinity of the drive shaft. They would lean against, or over, the shaft while setting up or unjaming bottles. Some even stepped on the revolving shaft while climbing onto the machine.

The drive shaft itself was modified by Pepsi Cola personnel subsequent to the installation of the bottle washing machine. A sprocket was changed to increase the shaft's speed. The record also discloses that approximately six months before Hartman's injury another employee's apron became caught in the unguarded shaft. This person was able to extricate himself, however, and avoided injury.

Hartman's injury occurred on February 23, 1970, about a year after the new bottle washing machine had been in operation. He had positioned himself near the shaft to operate the machine. While leaning over the shaft to set up some dirty bottles that had fallen over, as he had done on other occasions when operating the machine, his pants became caught in the shaft and he was pulled into its moving parts, resulting in injury. At that time there was no guard over the shaft and no stop switch in the near vicinity. One stop switch was located farther down the machine, and another was located on a wall on the other side of the machine.

After the evidence was presented the trial court instructed the jury on negligence, contributory negligence, strict liability as defined in § 402A of the Restatement of Torts 2d,[1] and assumption

---

1. Section 402A, Restatement of Torts 2d (1965), provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

of risk. As regards strict liability the jury was instructed, *inter alia*, that plaintiff must prove the defendant

> had knowledge of the probable danger of such defect in design, plan and manufacture of the machine, when used for the purpose for which intended and in the manner intended.

Hartman contends this instruction erroneously required proof of an element that need not be established under a cause of action premised on strict liability.

We have reviewed the record and find that it is unnecessary to consider the propriety of the trial court's instructions. Instead, we think the dispositive issue is whether strict liability instructions were appropriate.[2]

A party is entitled to an instruction on his theory of the case only if the theory is supported by competent evidence. General Motors Corp. v. Walden, 406 F.2d 606 (10th Cir. 1969). Hartman's theory, strict liability, necessarily required him to put forth evidence that the machine was defective and that its defective condition created an unreasonable danger to the user, to merit strict liability instructions. We believe he failed in both respects.

As concerns the product's defectiveness, the relevant evidence may be summarized as follows. It was virtually undisputed at trial that the machine's design included provision for a guard over the shaft. A Miller Hydro employee testified, by way of deposition, that guards are placed on all exposed shafts at the time a machine is manufactured and that he personally placed a guard on the shaft in question.[3] The Miller Hydro finished products inspector, also testifying by deposition, stated that he checked all of the guards on the bottle washing machine before it was dismantled for shipping, and that the machine had no exposed parts.

A Miller Hydro installation engineer said he found all guards for the machine at the time of installation and another said he personally placed a guard over the shaft in question. In fact, this employee said he stood on the guard while making adjustments on the top part of the machine.

A state safety inspector examined the machine shortly after its installation. He did not notice, and his report did not indicate, that the shaft's guard was missing.[4] Some Pepsi Cola employees testified that the guard was missing after installation, but could not definitely state that it was missing at the time of installation. Evidence also was introduced that Pepsi Cola personnel had performed remedial work on the shaft subsequent to installation, which would require removal of a protective guard, if one existed. And a Pepsi Cola employee testified that a guard, if taken off, could possibly end up on the scrap metal pile. This evidence is not sufficient to show the product was defective.

---

(a) the seller is engaged in the business of selling such product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

2. Hartman asserts that this argument, raised by Miller Hydro, is inappropriate for appellate consideration because no cross-appeal has been taken. We do not agree. An appellee may, without cross-appealing, urge in support of the judgment any matter appearing in the record. *See, e. g.,* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1970). Miller Hydro does not attack, in any respect, the judgment entered below. It merely asserts an additional reason why the judgment should be affirmed.

3. He stated that a guard is placed on a machine and then two holes are drilled through the guard into the machine, for bolts to hold the guard in place. The record discloses that there were two such holes near the drive shaft of the bottle washing machine.

4. His report did indicate that a guard on another machine was missing and that it should be installed.

Nor did Hartman present sufficient evidence on the question of whether the location of the stop switch rendered the machine defective. An expert testified that the system's designer, rather than the manufacturer, should be responsible for locating stop switches. Moreover, Pepsi Cola's production manager testified that he did not think a stop switch was necessary at the shaft location.

Hartman also had the burden of showing that the machine was unreasonably dangerous. A product is unreasonably dangerous only if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, with the ordinary knowledge common to the community as to its characteristics.[5]

Hartman testified he was never warned that a guard should be placed over the shaft, and that he did not know leaning against the exposed shaft was dangerous. As assistant production manager responsible for plant safety, however, he must be accredited with sufficient intelligence to realize that an exposed revolving shaft is dangerous. This conclusion is supported by the fact that another employee had previously become caught in the same shaft. Thus, it cannot be said that a danger existed which was beyond contemplation of an ordinary user. The danger was obvious.

The record thus establishes a lack of competent evidence to support a claim of strict liability. Although the trial court erred in instructing the jury thereon, we do not believe this was reversible error. Hartman merely received one more chance at recovery than he was entitled to receive, and cannot claim prejudice thereby.

Affirmed.

5. Restatement (Second) of Torts, Explanatory Notes § 402A, comment i at 352 states in part:

"The rule stated in this section applies *only where the defective condition of the* product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinarily sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."