**Leo J. LENHERR, Plaintiff,**

v.

**NRM CORPORATION, Defendant.**

**Civ. A. No. 76–169–C5.**

United States District Court,
D. Kansas.

Oct. 10, 1980.

R. Daniel Lykins, Jones, Schroer, Rice, Bryan & Lykins, Topeka, Kan., for plaintiff.

Charles L. Davis, Jr., Davis, Unrein & Hummer, Topeka, Kan., for defendant.

MEMORANDUM AND ORDER

SAFFELS, District Judge.

## I. FACTS

This case is a personal injury action which was tried to the Court on a theory of strict liability. The Court, after hearing evidence in the case and considering the post-trial briefs submitted by the parties, is prepared to make its ruling.

Plaintiff Leo J. Lenherr was injured on October 24, 1974, during the course of his employment with Goodyear Tire and Rubber Company in Topeka, Kansas, by a machine known variously as a squeegee machine, a band-builder servicer, a banner unit, or a festooner. This machine is one of a series of machines used in building bands for tires. Its function appears to be to intersperse layers of uncured corded rubber with cushion strips of rubber. Each squeegee machine is approximately 45 inches wide, six feet tall, and 25 feet long and consists of an upper and a lower level.

Plaintiff worked on two squeegee machines from his station in an aisle between the two units. He was responsible for both levels of both units. Each machine had two rolls of "gum" and four rolls of "squeegee." Plaintiff's job as a "squeegee man" was to replace these rolls as they were used up.

The rolls of squeegee consist of layers of rubber in between fabric liners. If there is a hole in the fabric, the layers of rubber will stick together. According to the testimony of Bob Hanson, a Goodyear employee for eleven years who has been a squeegee man in the past, holes in the fabric occur "constantly," or approximately one in every five liners. Additionally, the squeegee sticks to the liner. It is the responsibility of the squeegee man to "unstick" the layers of squeegee which become stuck together.

The squeegee machines are open along one side making the interior moving parts accessible to the workers. The material travels through the machines from north to south (from right to left on the injury machine as the operator faces it). The machines contain rollers which start fast but whose speed is not very fast during operation. There are three on–off switches controlling the rollers involved in plaintiff's accident, which are located at different points along the machine. If the "stop" button is pressed, the machine stops but it can be started up from any of the other switches. The machine can also be activated automatically, triggered when the amount of product on the storage rollers is low. There is a "lock–out" lever at all three on–off switches which when turned prevents the machine from being restarted automatically or from another work station. Workers are instructed to use the safety lock–out lever whenever they must reach into the machine. However, for problems which are considered minor the workers do sometimes reach into the machine without locking it off. Bob Hanson, who has had eleven years of experience on the various machines used in the band–building process and who saw plaintiff's injured arm immediately after the accident, testified that he still reaches into the squeegee machines without locking them off. He added that the machines wouldn't run very much if the workers locked them off every time something went wrong with them. Mr. Hanson also testified that layers of squeegee sticking together was considered a "minor" problem which took only "a couple of seconds" to cure by cutting the layers with a hot knife.

Plaintiff was a 19 year old high school graduate at the time of the accident and had worked at Goodyear for about a year. He had received eight weeks of training on the squeegee machine and had apparently worked at the job of squeegee man only a short time. On the evening of the accident

plaintiff had been working five and a half to six and a half hours since his last break.

Plaintiff was working on the # 1 machine (on his right as he was looking toward the front of the machine) which he had stopped and locked off when it became "balled up." Then he saw the upper level of the # 2 machine was also balled up, so he went to work on it. He locked out the upper table, repaired the trouble, and started the machine again. He returned to the # 1 machine which was still locked out, and while working there, noticed the lower level of the # 2 machine was fouled. The # 2 machine was not running, and plaintiff, without turning the lock–out lever, reached in to try to pull apart the squeegee layers. The machine came on two to three seconds after plaintiff had touched the roller and his right arm was caught by the rollers. With his left hand plaintiff struggled to reach the off switch which was about thirty inches to his right. Before he, or someone else, turned off the machine, plaintiff's arm had been twisted around by the rollers three and a half to four revolutions, and the fabric on the squeegee rolls had wrapped around the arm and acted as a tourniquet. Plaintiff was cut loose and taken to the hospital where the doctors amputated the right arm above the elbow. Plaintiff was right–handed.

After his wound healed, plaintiff was fitted with a prosthesis, underwent two weeks of vocational rehabilitation, and in February, 1976, began working again at Goodyear. He was assigned a job which included pulling racks of the completed tire bands weighing 150 to 200 pounds. Plaintiff strained his back pulling these racks with only one arm. Plaintiff was taken off the job in February or March, 1977, and told by a Goodyear employee, Merv Martin, to sign up for unemployment. When plaintiff filed his Workers Compensation claim, he was referred to a vocational counselor who suggested business school training. Plaintiff enrolled at a business school in 1978, and was still pursuing this course of study at the time of trial.

## II. *LIABILITY*

### A. *Identity of Manufacturer*

Plaintiff's first and, in the Court's opinion, his most difficult hurdle was proving that defendant, NRM Corporation, manufactured the machine by which plaintiff was injured. Defendant contends that plaintiff did not discharge this burden. However, the Court believes plaintiff has proved this element of his case with sufficient certainty. Therefore, Defendant's Motion for Involuntary Dismissal based on the premise that defendant did not manufacture the "injury machine," upon which the Court reserved ruling at trial, is overruled.

██ It is true that a plaintiff must show that a defendant had some relationship to the allegedly defective product, e. g., as a manufacturer, a retailer, or a distributor. *See* Restatement (Second) of Torts, § 402A, Comment f (1965). Fact questions may be established by circumstantial evidence. Although a fact is not proven by circumstances which are merely consistent with its existence, circumstantial evidence in a civil case need not rise to that degree of certainty which will exclude every reasonable conclusion other than the conclusion sought to be established. *Arterburn v. St. Joseph Hospital & Rehabilitation Center*, 220 Kan. 57, 61, 551 P.2d 886 (1976). "It suffices that such evidence affords a basis for a reasonable inference by the court or jury of the occurrence of the fact in issue, although some other inference equally reasonable might be drawn therefrom...." *Id.* (citing *American Family Mutual Insurance Company v. Grim*, 201 Kan. 340, Syl. ¶ 1, 440 P.2d 621 (1968)).

██ Defendant here contends that not only did plaintiff fail to prove that defendant *did* manufacture the machine in question, but also that defendant proved it was *not* the manufacturer. The Court finds that although no direct evidence was adduced showing that defendant manufactured the injury machine, sufficient circumstantial evidence exists to prove that fact by a preponderance of the evidence.

On the date of the injury there were six substantially identical squeegee machines in a row, having Goodyear numbers 06–23, 06–36, 06–32, 06–37, 06–34, and 06–41, from east to west. Plaintiff was injured on machine # 06–36. The four types of machines used in the band–building process at the Topeka Goodyear plant were: (1) a let–off stand (one for each bias cutter), (2) a bias cutter (one for every three squeegee machines)–to the west of the let–off stand and to the north of the squeegee machines, (3) a squeegee machine, and (4) a band–builder (one per squeegee machine)–at the south end of the squeegee machine. Defendant's Exhibit A and plaintiff's Exhibit 33, p. 6. Some of the squeegee machines are right–hand models (# 06–23, 06–37), and others are left–hand models (# 06–36, 06–32, 06–34, 06–41). The injury machine was a left–hand model, which means if a person is facing the direction of the product flow, the left–side of the machine is the open side.

Goodyear received squeegee machine # 06–36 on March 7, 1952. Goodyear records do not show from whom Goodyear purchased this machine. NRM records do not show that NRM manufactured or delivered the machine to Goodyear. There was no identifying manufacturer's nameplate on the machine when plaintiff began his investigation after filing this lawsuit. Much evidence was received on the subject of identifying tags and about NRM records. The Court believes that because of the age of the machines (approximately 28 years old), the absence of tags or the lack of record evidence does not compel the conclusion that defendant did *not* manufacture the machines whose manufacturer cannot be ascertained by means of tags or records.

Paint had to be scraped from the machines before any tags at all were found. Manufacturer's name tags were found on two of the squeegee machines (# 06–23 and # 06–41), five of the band–builders, and one of the let–off stands. These were all NRM tags with one exception; the tag on the westernmost band–builder was of the Lewis Machine Company, Cleveland, Ohio.

No tag was found on the bias cutter which fed the first three squeegee machines on the east, including the injury machine. However this bias cutter was admittedly manufactured by NRM. According to William Roorda, the NRM representative at trial, the tag was missing because a guard was replaced where the tag would have been. After 28 years, it is reasonable to believe that tags on other machines could have existed at one time and could have been removed for the same reason or for any number of other reasons.

Plaintiff's expert, Mr. Sevart, testified that he saw a place on the injury machine where a tag had been painted over at one time. Defendant's expert, Mr. Razak, and Mr. Roorda, observed no tags on the injury machine or evidence that a tag had once been affixed to it. It did not appear that anyone pointed out the place Mr. Sevart was talking about to Dr. Razak or Mr. Roorda so that they could comment on Mr. Sevart's observation.

It appeared from the testimony that Bob Hanson, a Goodyear employee, had discovered the NRM tags on squeegee machines # 06–23 and # 06–41 after scraping a great deal of old paint off the machines. He testified that those tags were of different sizes and in different locations on the machines. Mr. Roorda testified that in his visits to different plants, which average one per month, he has never found a machine manufactured by NRM without an identifying tag or an observable place where the tag might have been. He also testified that on the two squeegee machines identified as NRM machines the Goodyear identifying tag was located next to the NRM nameplate, while on the other squeegee machines, the Goodyear tag was in a different place on the machine. However, on redirect examination, Mr. Roorda said he couldn't honestly remember whether the NRM tags were in the same location on machines # 06–23 and # 06–41.

Goodyear records identify National Rubber Machinery Company (to which defendant succeeded) as the manufacturer of one of the squeegee machines in the vicinity of

the injury machine, namely, # 06–41. The same property records show a manufacturer's number on machine # 06–23 which corresponds to NRM records showing that machine was manufactured by NRM. Goodyear records do not identify any manufacturer for the other four squeegee machines, # 06–36, 06–32, 06–37, and 06–34.

A machine order list of NRM equipment with serial numbers 101 through 219 was offered into evidence (Exhibits 28 and G). For each machine it showed the customer and the purchase order number, and sometimes, but not always, a size and a date. Of those machines listed prior to March 7, 1952 (the date the injury machine arrived in Topeka), 57 were sold to Goodyear at its various plants. Of those 57, nine were listed as 45–inch machines, 28 had no size indicated, and 20 were listed as 40–inch machines. To further complicate matters, Paul Huss, a Goodyear engineer for 30 years and defendant's witness, testified that he thinks the 40–inch and 45–inch machines are interchangeable. One of the squeegee machines identified as an NRM machine (Goodyear # 06–41, NRM # 184) has its size listed on Exhibit 28 only as "M–27307."

Defendants introduced Exhibit Q into evidence to show conclusively that NRM could not have manufactured the injury machine. Exhibit Q supposedly shows that the first left–hand "band–builder" was shipped by NRM to Goodyear on May 15, 1952, or two months after the injury machine (a left–hand model) was received by Goodyear. Exhibit Q is a page from a record book kept by NRM's accounting department. This record is incomplete and contains several inconsistencies with the machine order list attached to Exhibit 28. Exhibit Q only begins with Serial # 145, dated June 30, 1949. Although Mr. Roorda testified that NRM did not manufacture band–builder services prior to 1951, he has only been with the company since 1974, and so must base his conclusion on old records which can be inaccurate or subject to misinterpretation. Exhibit Q does not account for machines with serial numbers 162 and 166. (NRM # 162 is Goodyear machine # 06–23 and

definitely exists.) Exhibit Q also shows three machines, serial numbers 170, 171, and 187, as 48–inch machines, while Exhibit 28 lists those machines as 45–inch machines.

In addition to these flaws in Exhibit Q itself, the Court is suspicious of the circumstances surrounding its appearance at trial. Mr. Roorda testified that he accidently discovered the record book containing Exhibit Q in late 1979, but that he didn't realize it must be sent to plaintiff as a part of defendant's duty to update discovery responses and he thought it duplicated material he had already furnished to plaintiff. Defendant claims the page of the record book constituting Exhibit Q was supplied to plaintiff in May, 1980, as the last page of an attachment to a response to plaintiff's Request for Production of Documents. (See Exhibit G.) Defendant introduced Exhibit G on the second day of trial; plaintiff's attorney objected at that time, claiming he had never received the document, and although he had received most of the material among other discovery, he had never seen the last page. The last page of Exhibit G was later admitted separately as Exhibit Q.

The Court is aware that defendant does not have the burden of proving that it did not manufacture the injury machine, but defendant claims it has proved it did not manufacture the injury machine. For the foregoing reasons, the Court believes that defendant's proof has fallen short of its goal, and that after all the evidence on name–plates and records was presented, the identity of the manufacturer of the injury machine was still unknown. Defendant, with all its thoroughness, did not present any evidence of other companies who manufactured squeegee machines in the 1950s and might have sold them to Goodyear. The Court is unable to find that NRM did not manufacture left–hand band–builder services before May 15, 1952, and thus is unable to rule out defendant as the manufacturer of the injury machine.

The testimony of John Sevart, plaintiff's expert witness, on the subject of the injury machine's physical characteristics persuades

the Court that it is more likely than not that defendant did in fact manufacture the injury machine. This evidence is bolstered by the fact that five of the squeegee machines, including those of known NRM manufacture, were ordered by the same Goodyear purchase order (# 38319) as shown by the Goodyear property record cards (Exhibits 2–7).

Of all the witnesses Professor Sevart made the most thorough inspection of the injury machine for evidence of the manufacturer's identity. In addition, he was the only person to inspect in detail any of the other squeegee machines and to compare his findings with what he observed on the injury machine. In Professor Sevart's expert opinion, the same manufacturer made all six machines and, specifically, machines # 06–41 (NRM machine # 184) and # 06–36 (the injury machine). He based his opinion on: (1) the similarity of their appearance; (2) the similarity of motors; (3) the presence of parts with the same part numbers; (4) the existence of the same imperfection on cast parts; (5) the appearance of manufactured parts on both machines which indicated they were manufactured by the same process; and (6) the existence of distinctive imprints on the sheared edges of certain small parts which would not ordinarily be purchased from other companies.

The number 60983 was found on the festoon cam followers on all six machines. Mr. Roorda testified that the cam followers were manufactured by a bearing manufacturer and that the number 60983 was not an NRM number. The Court wonders how Mr. Roorda can say with certainty what were or were not NRM numbers in 1951–52, since the Court has seen how inconclusive old records can be. The Court also wonders why defendant did not introduce any evidence of the company manufacturing cam followers if Mr. Roorda knew who made them.

The number 44698 appeared on all six machines on cast parts which appeared to be original to the machinery. The digit 9 was out of alignment, i. e., about one millimeter higher than the other digits, and had a small dot near it. Defendant disputed the meaning of this evidence, contending that it did not prove defendant manufactured all machines with parts having the same imperfection. Defendant asserted they were cast parts and the existence of the identical flaw only indicates the parts were cast at the same foundry from the same pattern. Defendant theorizes that Goodyear made the pattern and then had a large volume of parts cast by one foundry for later supply to manufacturers who were building equipment ordered by Goodyear. This appeared to be pure speculation on defendant's part, namely by its employee, Mr. Roorda. Professor Razak agreed that the cast parts could have been manufactured in this manner. However, he had no way of knowing what occurred in the tire industry 28 years ago. Defendant presented no evidence to support this theory of manufacture of cast parts.

Master Company motors with style number 176802 and Wagner Company motors with style number 144E20 were found on all six machines. Bob Hanson, who scraped many layers of paint and grease from the motors to find the numbers, testified that the motors appeared to be as old as the machines themselves.

Professor Sevart testified that with the aid of a magnifying glass he inspected different sheared surfaces on machines # 06–41 and # 06–36. The parts he looked at were not cast or molded but had been cut from iron or steel sheets, and they were pieces which would not have been bought elsewhere but would have been fabricated by the manufacturer of the entire machine. Professor Razak and Mr. Roorda disputed Professor Sevart's conclusion that cut edges have unique characteristics as well as his ability to observe any characteristics at all without high–powered magnification, especially when the edges were covered by layers of paint. Professor Razak was a credible and qualified expert witness; on the other hand, Mr. Roorda, although possessing a background in sheet metal work, was obviously biased in this case and even hostile to plaintiff's counsel. Therefore, the

172

Court believes it should discount his testimony accordingly. Professor Sevart was also a qualified expert witness and supported his conclusions with detailed reasoning. The Court as the finder of fact must decide which evidence deserves the greatest weight. In this instance, for the foregoing reasons, the Court believes it is justified in relying on Professor Sevart's expert opinion and therefore finds by a preponderance of the evidence that NRM manufactured the injury machine.

### B. *Strict Liability*

Plaintiff has indicated he is proceeding solely on a theory of strict liability. In *Brooks v. Dietz*, 218 Kan. 698, 545 P.2d 1104 (1976), the Kansas Supreme Court adopted strict liability in tort as a separate theory of recovery in defective product actions as set out in § 402A of the Restatement (Second) of Torts (1965).

The elements necessary to prove liability under this theory are: (1) that defendant is engaged in the business of producing and selling band–builder servicers (squeegee machines), or is responsible for placing them in the stream of commerce; (2) that the squeegee machine involved in this case was in a defective condition unreasonably dangerous to persons who might be expected to use or be affected by the product; (3) that the squeegee machine was in a defective condition at the time it left the control of defendant's predecessor; (4) that the squeegee machine was expected to and did reach Goodyear (the purchaser) without substantial change in the condition in which it was sold; (5) that the defect in the squeegee machine contributed in some measure to the injuries sustained by plaintiff. Pattern Instructions for Kansas 2d 13.22.

Defendant's records clearly show defendant's predecessor, National Rubber Machinery Company, was engaged in the business of producing and selling 45–inch band–builder servicers in 1951–52, and the Court so finds. Exhibit 28 shows National Rubber Machinery sold fifteen such machines to Goodyear and 219 machines in a variety of styles, all used in tire building, to various tire manufacturers.

Plaintiff claims that the squeegee machine upon which he was injured was defectively designed and that the defective design made the machine unreasonably dangerous to him as a user of the machine. Plaintiff claims the machine was defective in the following particulars: (1) it was not designed to prevent entry into the moving parts while it was running; (2) it was not designed to warn operators that it had been activated and would begin moving imminently; and (3) it did not have an emergency stop mechanism ("panic bar") which could be activated by a part of the body other than the hand.

■ A product is "defective" when it leaves the seller's hands in a condition not contemplated by the ultimate consumer and as a consequence of such condition will be unreasonably dangerous to the consumer. Restatement (Second) of Torts § 402A, comment g (1965). The defect may arise from the design of the product. A product may also be defective without any ascertainable defect in the product and although the product was precisely what it was intended to be, if the manufacturer fails to give adequate and timely warnings as to the dangers or hazards which may result from a foreseeable use or misuse of the product. Restatement (Second) of Torts § 402A, comment j (1965).

■ A product is "unreasonably dangerous" if it is dangerous to an extent beyond that which would be contemplated by the ordinary person who uses it, with the ordinary knowledge common to the community as to its characteristics. Restatement (Second) of Torts § 402A, comment i (1965); *Hartman v. Miller Hydro Company*, 499 F.2d 191, 194 (10th Cir. 1974). In order to prevent a product from being unreasonably dangerous, the seller may be required to give warnings as to its use. Restatement (Second) of Torts § 402A, comment j (1965).

■ The Court finds that the squeegee machine in question was defective in its design because it lacked certain safety features. The rollers in which plaintiff be-

came entangled are not guarded in any way. The ordinary operation of the machine requires the workers to put their hands and arms into the machine frequently. The machine can be started from various locations.

While it is true that the injury machine possessed a safety device–the lock–out lever–which, if used by plaintiff would have prevented his injuries entirely, the Court believes that the design of a potentially dangerous machine must take human characteristics into account. Therefore, the existence of a single safety feature may not be enough to prevent a machine from being "defective." The Court agrees with Professor Sevart that the design of this machine overlooks human factors, namely, the hectic, monotonous character of production line work and the tendency of workers to bypass a safety device, especially when the machine is not running and appears safe. Because the speed of the rollers was slow and because the Goodyear employees regularly reached into the machine without turning it off, plaintiff did not appreciate the seriousness of the danger to which he was exposed.

The danger resulting from the absence of safety devices was unreasonable in this case because the hazard created the risk of serious injury and the risk could have been greatly reduced by the addition of economically and technically feasible guards and/or warning devices.

Professor Sevart testified that interlock guarding was used on mechanical machinery as early as the 1920s and was certainly within the state of the art of machine design by the 1950s. An interlock guard is an .electrical switch which prevents a machine from operating when the guard is in place. Professor Sevart used the example of a clothes dryer door. Such a guard might consist of a gate in front of the hazardous area which requires operator involvement (the rollers here). When the operator slides the gate open to work on the machine, the gate automatically trips a switch which shuts off the machine. The machine cannot then be restarted until the gate is closed. This eliminates the need for operator discretion or decision making. In fact, the squeegee machine did possess an interlock guard over one of its powered rollers, where the hazard was equal to the hazard of the rollers which injured plaintiff.

A delay start mechanism, using warning bells and flashing lights after the machine has been turned on but before it actually starts moving, would have been an additional safeguard, or, by itself, would at least have alerted a worker to an imminent danger.

Finally, at the bare minimum, safety considerations require an emergency stop mechanism to compensate for human failure to use existing safety devices and to avoid serious injury when an accident does occur. The stop button on the injury machine was approximately thirty inches to the right of the hazardous area. Professor Sevart testified that 90% of the population is right–handed. Thus, a worker is most likely to be reaching into the machine with his right hand, and, if his right arm is caught by the rollers, as plaintiff's was, he must reach across his body with his left hand for a distance of two and a half feet to stop the machine, while his arm is being twisted by the powerful rollers. Both Professor Sevart and Professor Razak testified that the machine should have had a "panic bar" which could have been pressed by a worker's feet or his chest or a part of his body other than his hand. Professor Sevart said that such a device was well–known by 1950. In his opinion, plaintiff's injuries would have been only minor if there had been a panic bar on the machine. He estimated the speed of the rollers at four to five seconds per revolution, and plaintiff testified that his arm went around three and a half to four times. That indicates it took plaintiff 14–20 seconds to shut off the machine. Professor Sevart testified the instinctive reaction time of a young man is three seconds, the time it would have taken plaintiff to hit an emergency stop device if there had been one.

While this latter defect in design was not the cause of plaintiff's accident, his injuries were much more severe as a result of the

absence of a panic bar. This is analogous to the crashworthiness concept in vehicle design where a vehicle manufacturer is held liable for injuries caused by a design defect even though the accident itself was not caused by the defect. Here, the accident was caused by one design defect and plaintiff's injuries were enhanced by another design defect. Judge Rogers has discussed this problem of causation in *Stueve v. American Honda Motors Company, Inc.*, 457 F.Supp. 740, 758–760 (D.Kan.1978). The Court believes it is justified in including in its determination of the defectiveness of the injury machine a design defect which did not cause plaintiff's accident but did cause most of his injuries. The Court concludes the combined design defects did cause the injuries sustained by plaintiff.

Because we have found that the defect in the injury machine was one of design, it follows that the machine was defective at the moment of manufacture and thus at the time it left the manufacturer's control. We further find that the machine was expected to and did reach Goodyear without substantial change in the condition in which it was sold. Therefore, the Court finds that all of the elements necessary for recovery under a strict liability theory have been proved by a preponderance of the evidence in this case.

### C. *Non–designing Manufacturer Problem*

■ The evidence, through the testimony of Goodyear engineers and Goodyear drawings, established that Goodyear designed the 45–inch squeegee machine and sent the design out for bids to be manufactured by other companies. It appears to the Court that there are very few reported cases on the liability of a manufacturer for a defectively designed product when someone else is the designer. Most of those cases which do discuss the issue are decided on the basis of negligence concepts. *E. g.; Spangler v. Kranco, Inc.*, 481 F.2d 373 (4th Cir. 1973); *Maryland Casualty Co. v. Independent Metal Products Co.*, 99 F.Supp. 862 (D.Nebr. 1951), *aff'd*, 203 F.2d 838 (8th Cir. 1953). It is logical to absolve a manufacturer from liability for a negligently designed defective product when the manufacturer is not the designer and plaintiff's theory of recovery is negligence. Under those circumstances a manufacturer is liable only if the defect in design is sufficiently obvious to alert a reasonably competent manufacturer to the danger. *Littlehale v. E. I. duPont deNemours & Co.*, 268 F.Supp. 791 (S.D.N.Y.1966), *aff'd*, 380 F.2d 274 (2nd Cir. 1967).

The few cases which have arisen in a strict liability context say that it is only necessary that the product be defective when it leaves defendant's control, if the other elements of strict liability are present. *E. g., Challoner v. Day and Zimmerman, Inc.*, 512 F.2d 77, 83 (5th Cir.), *vacated on other grounds*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975), *rev'd on other grounds*, 546 F.2d 26 (1977); *Wirth v. Clark Equipment Company*, 457 F.2d 1262, 1267 (9th Cir. 1972), *cert. denied*, 409 U.S. 876, 93 S.Ct. 127, 34 L.Ed.2d 129. These cases in turn cite § 402A of the Restatement which says that anyone who sells a product in a defective condition unreasonably dangerous to the user is liable for physical harm to the user caused by such condition. Subsection (2) states that this rule applies even if "the seller has exercised all possible care in the preparation and sale of his product ..." Under this rule retailers are held liable for manufacturing defects which they have not caused. *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964). Two of the policies underlying strict liability are the reliance rationale and the loss spreading rationale. The reliance rationale is based on the belief that the public has a right to rely on sellers who market products to stand behind their products and compensate a member of the public injured by defects in their products. The loss spreading rationale recognizes the devastating burdens on a consumer injured by a defective product. Strict liability instead places the burden on manufacturers and sellers who treat the cost as a cost of doing business. This ultimately is passed on to future consumers of the product, and the injured person's loss is born by society. *See* comment c, Restatement (Second) of Torts § 402A.

Kansas courts have not spoken on the liability of a non–designing manufacturer of a product for a defective design. Based on the adoption of strict liability by the Kansas Supreme Court and the policies behind strict liability, this Court believes the Kansas Supreme Court would hold a manufacturer liable under a theory of strict liability in circumstances similar to the case under consideration.

### D. Comparative Negligence Principles Applied To Strict Liability In Tort

Judge Rogers of this Court predicted in *Stueve v. America Honda Motors Company, Inc.*, 457 F.Supp. 740, 756 (D.Kan.1978), that some form of comparative liability would be applied to strict liability actions when the question reached appellate review in the state court system. The Kansas Supreme Court has not yet decided the question, but the Kansas Court of Appeals has recently held that the doctrine of comparative negligence is applicable to strict liability claims. *Kennedy v. City of Sawyer*, 4 Kan.App.2d 545, 553, 608 P.2d 1379 (1980). That court perceives that "[w]hat is involved is causal responsibility for the injurious incident or event," and believes that the doctrine more correctly should be called "comparative causal responsibility" or "comparative causation".

We find that this doctrine of comparative causation, utilizing comparative negligence concepts, should be applied to the instant case.

The Kansas Court of Appeals in *Kennedy*, 4 Kan.App.2d at 557, 608 P.2d 1379, also held that "application of the doctrine of comparative negligence renders the form of contributory negligence which commonly passes under the name of assumption of the risk an incomplete defense in a strict liability action ..." This means plaintiff's conduct will merely be considered in apportioning causal responsibility, and plaintiff's recovery will be reduced accordingly. The elimination of "all–or–nothing" defenses is an equitable solution, allocating the burden of a loss in proportion to responsibility for that loss. As the Kansas Supreme Court

said in *Brown v. Keill*, 224 Kan. 195, 203, 580 P.2d 867 (1978), a manufacturer should not be compelled to pay more than his fair share of a loss. On the other hand, neither should an injured plaintiff be completely barred from recovery because of his misconduct which is only a partial cause of his injuries. Such a plaintiff should be allowed to recover for that percentage of his loss attributable to the product defect. *See Stueve*, 457 F.Supp. at 754.

The *Kennedy* holding makes it unnecessary for this Court to distinguish among the different labels attached to defenses based on plaintiff's misconduct, i. e., contributory negligence, assumption of the risk, or product misuse. *See, Stueve*, 457 F.Supp. at 752.

Plaintiff's own conduct partially caused his accident. Rather than bar him from recovery entirely, the Court will compare plaintiff's causal responsibility with that of all persons who contributed to causing the accident in which plaintiff was injured. The Court will then assign to each person a percentage reflecting that person's causal contribution to plaintiff's injuries. The Court has weighed the respective contributions of the parties to the occurrence and hereby finds the causal responsibility for this accident and for plaintiff's injuries should be apportioned as follows: Goodyear–50%, plaintiff–35%, and defendant–15%. Goodyear is not a party to this action, but its "negligence" can be compared under the "phantom party" concept used by this Court to assign fault where not all wrongdoers are joined in a lawsuit. *See Greenwood v. McDonough Power Equipment, Inc.*, 437 F.Supp. 707, 712 (D.Kan.1977). In making its allocation, the Court has considered the extent to which each party could have foreseen the possibility of injury, the extent to which each party was in a position to control the circumstances which led to the injury, and the ease with which each party could have taken steps to make injury less likely.

The Court finds that Goodyear, as the designer of the injury machine and as a

company engaged in the manufacture of tires, could have best foreseen the possibility of injury to workers operating the squeegee machines. Goodyear knew the machine's purpose and its method of operation; it could have foreseen that certain malfunctions would occur in the ordinary course of production and it could have predicted what methods workers would be likely to use to deal with them, e. g., reaching into the moving machine to separate the layers of squeegee stuck together. Goodyear was also in the best position to prevent the defect which led to the injury and could have most easily taken steps to make the injury less likely in that the design defect could have been eliminated at the drawing board with a minimum of effort and expense.

In addition, as an employer, Goodyear should have noticed that its employees were routinely bypassing the safety lockout device and should have taken steps to discourage or prevent the unsafe practice.

Plaintiff's own culpability lies in the fact that he had the safety lockout device available to him and neglected to use it. However, he took the action of reaching into the machine without thinking and while the machine was not moving. Although he had been instructed not to reach into the machine without locking it off and he knew it was a risk to do so, plaintiff had done it many times before and knew co–workers did it as well. It is clear that plaintiff did not fully appreciate the magnitude of the danger he was encountering by not locking off the machine.

Judge Rogers has said that the standard for gauging assumption of the risk as laid down in *Brooks v. Dietz*, 218 Kan. 698, 545 P.2d 1104 (1976), is a subjective one, and therefore a jury may "take into account plaintiff's youth, inexperience, and lack of training in deciding whether he fully appreciated the risk he faced." *Ervin v. Economy Baler Company*, No. 74–145–C5, *unpublished*, slip opinion at p. 11, (D.Kan. December 28, 1976). Plaintiff in this case was only 19 years old at the time of the accident and had worked on the squeegee machine only a short time, although he had received eight weeks of training on the machine. Other subjective factors the Court notes are the standard practice of Goodyear employees, plaintiff's peers, to take the same sort of action plaintiff took prior to the accident; the slow speed of the moving rollers; the monotonous yet hectic pace of the production line work; and the events leading up to the accident. Plaintiff testified that he was working on one machine which had fouled, that he turned to work on the upper level of the injury machine which had fouled, that he turned back to work on the first machine which he had not completed, and then he noticed that the lower level of the injury machine was fouling as well. This succession of occurrences seems to have impaired plaintiff's judgment to the point that he was acting automatically rather than making conscious decisions.

The Court finds that plaintiff did use the squeegee machine unreasonably, but that his conduct was not the sole cause of his accident and resulting injuries. The Court therefore assesses the percentage of plaintiff's causal responsibility at 35% of the whole.

Defendant's involvement in the accident is slight. NRM Corporation as the successor to National Rubber Machinery Company is responsible for the defectiveness of the machine under the theory of strict liability because it placed the machine into commerce; it manufactured and sold the machine for ultimate use by consumers. As stated before, the non–designing manufacturer's role in a products liability action for a design defect is analogous to the role of a retailer or distributor in an action for a manufacturing defect. The distributor is liable under the strict liability requirements although he exercised extreme care. His liability exists by reason of his position in a chain of distribution to the consumer and the policy considerations behind the adoption of strict liability.

## III.  DAMAGES

The Court finds that damages sustained by plaintiff resulting from his acci-

dent and the subsequent amputation of his arm should include the following elements: past and future pain and suffering, both physical and mental; permanent disfigurement; disability; medical expenses; loss of earnings due to his disability; and projected loss of earnings due to his disability. *See* Pattern Instructions for Kansas 2d 9.01.

Plaintiff's medical expenses for the arm injury alone were stipulated to be $2,707.56. Exhibit 27. The stipulated figure includes the cost of one prosthesis and two weeks of rehabilitation training. There was testimony that plaintiff injured his back on his return to employment at Goodyear as a result of lifting and pulling with only one arm. However, no medical testimony was received on this subject.

Plaintiff was off work recovering from his injuries from October, 1974, until February, 1976. Before the injury he was earning $5.00 an hour and he worked approximately 48 hours a week. The Court computes his weekly wage at $260.00, or $200.00 for 40 hours, plus $60.00 for eight hours at time and a half. Plaintiff's recovery period was approximately 68 weeks. His lost wages for that period equal $17,680.00.

Plaintiff returned to Goodyear in February, 1976, and was assigned a different job, with an hourly wage of $5.80. Goodyear employees went out on strike in April and returned to work in September, 1976. Plaintiff continued working until he hurt his back in February, 1977, and he was told to collect unemployment by Mervin Martin, Goodyear's supervisor of disabled employees.

Plaintiff testified he collected 80% unemployment for approximately nine months and then enrolled in business school to learn another occupation. He was still attending school at the time of trial.

The Court finds that $323,981.32 represents plaintiff's diminished earnings due to his disability from 1977, the year he left Goodyear. Plaintiff's age in 1977 was 21 years, so he has a 44 year working life expectancy to an age 65 retirement. Pursuant to the directions of the Tenth Circuit Court of Appeals in *Steckler v. United States,* 549 F.2d 1372, 1378 (10th Cir. 1978), we will take into account the probable wage inflation during plaintiff's 44 year working expectancy. The Bureau of Labor Statistics Reports for the 1967–1979 period demonstrate an average annual percentage wage increase of 6.6%. The Court finds this is a reasonable inflation rate for our purposes. The inflated amount of lost future earnings awarded in a lump sum must be reduced to present value to take account of the earning power of money invested over a long period of time. The Court finds a reasonable discount rate for reduction to present value is 6.25%, based on the average rate of yield for short–term investments. Plaintiff's lost future earnings, considering probable future wage inflation and reducing to present value, amount to $330,514.18.

The Court finds that plaintiff has sustained damages attributable to pain and suffering, physical and emotional, past and present, to permanent disfigurement, and to disability (i. e., the inability to perform normal functions, such as household chores, personal care, and leisure activities) in the amount of $300,000. The Court bases its finding on the testimony of plaintiff and his sister. The Court had the opportunity to see this young man in the courtroom and to appreciate the devastating effect the loss of his right arm has had on his life. Before his accident he was a very active right–handed person who pursued sports activities, particularly hunting, and liked physically strenuous outdoor work. Although he had resumed hunting and had learned to shoot with his left arm by the time of trial, he was still severely limited in the kinds of activities he could perform successfully. He is unable to ski or play basketball or football, pursuits he had enjoyed formerly. Normal chores are extremely difficult for him to perform. He has particular trouble with washing himself, tying his shoes, lighting a match, buttoning his shirts, and cutting his food at meals. A person has very limited use of a prosthesis when the amputation is above the elbow. There is a 25–pound weight limit on lifting with the whole arm and a one–pound limit on lifting

with the forearm. Plaintiff experiences constant pain in the stump and has developed rashes from wearing the prosthesis. He also experiences the phantom feeling of the missing arm which is common among amputees. Plaintiff's sister testified that he had been an outgoing young man prior to the accident but had become withdrawn and shy afterwards. She also testified that he is afraid to date girls or to become seriously attached to anyone.

The Court has found that the damages sustained by plaintiff consist of his medical expenses of $2,707.56, lost wages of $17,680, lost future earnings of $330,514.18, and $300,000 compensation for his pain and suffering, amounting to a total of $650,901.74. The Court has found the percentage of defendant's causal responsibility is fifteen percent. Therefore, defendant is liable in the amount of $97,635.26.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure the foregoing Memorandum and Order is hereby adopted as the Court's findings of fact and conclusions of law.

IT IS THEREFORE ORDERED that judgment be entered in favor of the plaintiff in the amount of $97,635.26.

IT IS FURTHER ORDERED that defendant's Motion for Involuntary Dismissal be, and it hereby is, overruled.